IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-8-2 |
| FRED BLAKLEY<br>a/k/a "Fred Blakely"<br>a/k/a "Floyd Blakely" | : | |

**PRETRIAL DETENTION ORDER**

AND NOW, this 24th day of February, 2025, after an evidentiary hearing and argument of counsel for the government and the defendant, the Court finds that:

(a) the government has proved by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required; and

(b) the government has proved by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community, as required by Title 18, United States Code, Section 3142(e).

The Court makes the following findings of fact:

This case is appropriate for detention under Title 18, United States Code, Section 3142(e) because:

1. There is probable cause to believe that the defendant has violated 18 U.S.C. § 1349 (mail and wire fraud conspiracy – 1 count); 18 U.S.C § 1343 (wire fraud – 4 counts); 18 U.S.C § 1341 (mail fraud – 3 counts); and 18 U.S.C. § 371 (conspiracy – 1 count) as charged in the indictment.

2.	The evidence in this case is strong. As detailed in the indictment, the charges resulted from an extensive undercover operation that captured the defendants' statements and admissions along with multiple search warrants that retrieved evidence from the defendants' offices, home, and email accounts. Taken together, this evidence shows that the defendant helped his wife to operate a chain of unlicensed medical clinics at which they purported to diagnose and treat a range of human diseases, including cancers. Because their treatments were unapproved and ineffective, their many clients were deprived not only of the money that they paid for the bogus treatments, but also of the opportunity to obtain legitimate medical care. The threat that Blakley will resume his phony medical care if released makes him a danger to the community if released; a danger that cannot be mitigated by any means short of detention.

3.	The defendant has a criminal history dating back to 1992. Most pertinently, Fred Blakley was arrested in May of 1997 and later charged in the District of Nevada with conspiracy to possess with intent to manufacture and manufacturing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(d)(1).[1] While on bail awaiting trial in federal court, Blakeley violated the terms of his pretrial release by absconding from supervision. He was later located and arrested in the District of Minnesota, was returned to the District of Nevada, pleaded guilty, and was sentenced to 60 months incarceration followed by five years of supervised release. He was released from incarceration on March 26, 2001.

---

[1] At the time Fred Blakley was charged, 21 U.S.C. § 841(d)(1) prohibited possessing a listed chemical with the intent to manufacture a controlled substance. This subsection of the statute currently prohibits boobytrapping federal property.

4.  Although Blakley's prior federal charges were lodged more than 20 years ago, the fact that he promptly fled rather than honor his commitment to appear in court suggests that he is likely to pursue the same course now. Indeed, given his age, and given the prospect of a very substantial sentence for the current charges, his incentive to flee is even greater now.

5.  Based on the current charges, the defendant faces a maximum possible sentence on the current charges of 165 years of imprisonment. Given an economic loss of $2 million, the government conservatively estimates a sentencing guideline range for the defendant of at least 87-108 months. Here, given that the defendants' victims suffered very substantial non-economic losses, an upward departure or variance is possible.

6.  The FBI undercover operation that led to the pending fraud indictment also established that Blakley had been operating a firearm manufacturing, assembly, storage, and sales facility. A search of that location resulted in the recovery of about 39 firearms and in excess of 48,000 rounds of ammunition. As a felon, Fred Blakley was not permitted to possess even one gun or bullet, much less the arsenal that he controlled. In a post-arrest statement, Fred Blakley admitted that he knew that it was unlawful for him to possess firearms and that he had done so anyway.

7.  Given the quantity and type of weaponry that Blakley possessed as a felon, he could contemplate that additional firearms-related charges may be forthcoming. This probability makes Blakley's incentive to flee all the greater.

8.  The weapons discovered at Blakley's workshop included non-conventional weapons, such as suppressors and, by Blakley's recorded admissions, a fully automatic rifle. The

fully automatic weapon was not recovered when the FBI searched Blakley's gun workshop. That dangerous weapon remains at large and, if Blakley were released, would be available to him.

9. Blakley presents a public danger not just from his unlawful possession of dozens of firearms and tens of thousands of rounds of ammunition, but from his expressed intentions to use his weapons to kill other people. In recorded conversations, Blakley expressed the desire to acquire armaments that were particularly lethal to human beings and to use them to kill persons whose political views diverged from his own "without any thought of remorse." Blakley also expressed not only a willingness to die, but a sense of inevitability that he would do so fighting against government agents.

10. The recorded conversations and evidence recovered from search warrants also established that Blakley was remarkably resourceful in acquiring weapons despite his prohibited status. In recorded conversations he detailed extensive successful efforts to straw purchase firearms through others, to acquire them through undocumented personal exchanges, and to build them himself. Moreover, Fred Blakley's emails disclosed hundreds of pieces of correspondence with firearms dealers and sellers, as well as actual deliveries by mail or carrier. It is therefore probable that, unless Fred Blakley is detained, he will find a way to acquire firearms and, having done so, will pose an imminent danger to law enforcement officers and members of the public.

11. There is also probable cause to believe that Fred Blakley has the means to flee. He lives only a few hours' drive from the Mexican border. By the time Pretrial Services received an alert and arrived to investigate, Blakley could be in Mexico, even without a passport.

12. Blakley, moreover, may well have sufficient assets to make that flight possible. In recorded conversations Blakley and Mary Blakley explained that they had been storing their

wealth in precious metals, but that they had been moving to cryptocurrencies. More than a year before his arrest, Blakley represented that he had already accumulated about $293,000 in cryptocurrency. The FBI search disclosed more than $25,000 in cash, gold coins, and a gold bar, none of which Blakley revealed to Pretrial Services. The search also uncovered indicators that the Blakleys do possess cryptocurrency, but the government has not yet been able to establish the value of their accounts. Once again, Blakley did not reveal this asset to Pretrial Services, suggesting that it would be available to finance Blakley's eventual escape.

13. The strength and nature of the case against the defendant, combined with the strong likelihood that the defendant will be incarcerated for a significant period of time, establishes the defendant's danger to the community and increases the high risk that the defendant will not appear as required by the Court.

Therefore, IT IS ORDERED that the defendant be committed to the custody of the Attorney General for confinement in a correction facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; that the defendant be afforded reasonable opportunity for private consultation with counsel; and that, on order of a Court of the United States, or on request of an attorney for the government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

BY THE COURT:

/s/Elizabeth T. Hey, U.S.M.J.
HONORABLE ELIZABETH T. HEY
*United States Magistrate Judge*