**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | :    Criminal Action No. 25-CR-08 |
| | : |
| FRED BLAKLEY | : |
| | : |
| Defendant. | : |
| | : |

---

DEFENDANT'S OMNIBUS *PRETRIAL MOTION* TO
DISMISS COUNTS TWO THROUGH EIGHT OF
THE INDICTMENT & DEFENDANT'S *MOTION IN
LIMINE* TO EXCLUDE AGENT RECORDINGS AND
INTERACTIONS

---

Defendant Fred Blakley, by his attorney Megan J. Davies, Esquire, hereby moves (1) to dismiss counts two through eight of the superseding indictment and (2) to exclude agent audio and video recordings, communications, and testimony arising from the undercover agents' interactions with the defendants during the undercover investigation.

## <u>Introduction</u>

First, pursuant to Rule 12(b)(2), Mr. Blakley moves to dismiss Counts Two through Eight because they do not state an offense as a matter of law. Each of those counts rests solely on interactions with undercover federal agents, individuals who could not be deprived of property and could not be influenced in the manner the materiality element requires. Without a real victim or a decisionmaker capable of economic harm, the Indictment omits an essential statutory element, and dismissal is mandated.

Second, Mr. Blakley moves *in limine* to exclude all recordings, communications, and related testimony from those undercover operations. Count One alleges a conspiracy to defraud real patients, yet the agent-created interactions do not resemble actual patient encounters and have minimal probative value. Admitting them would mislead the jury, create unfair prejudice, and confuse the issues, precisely the harms Rule 403 is designed to prevent.

Together, these motions seek to ensure that this case proceeds only on charges that meet the statutory elements and on evidence the jury can fairly and lawfully consider.

## Factual Background

In connection with what the Government alleges to be the operation of sham medical clinics, Fred Blakley ("F. Blakley") is charged along with his wife, Mary Blakley ("M. Blakley"), in a nine-count indictment alleging conspiracy to commit mail and wire fraud, substantive mail and wire fraud, and conspiracy to defraud the FDA. The federal investigation into the Blakleys began in 2021, culminating in an indictment filed on January 8, 2025, followed by a superseding indictment filed on June 5, 2025.

In approximately 2020, the FBI received a complaint from a father who alleged that his daughter had been the victim of international healthcare fraud involving a fake cancer cure. The daughter had been receiving treatment for breast cancer in Philadelphia, Pennsylvania, when she was approached by an unknown man about obtaining overseas treatment. She traveled to Southeast Asia for the treatment, ending her care in the United States. She died while undergoing the overseas treatment protocol. Neither F. nor M. Blakley were ever alleged to have had any connection to the initial complainant or his daughter. The FBI investigated the tip, dubbing the operation the "Philippines Protocol." Ultimately, however, the FBI determined that access issues precluded further investigation into this overseas operation.

During the FBI's subsequent investigation within the United States, agents identified M. Blakley as an individual associated with the "Philippines Protocol" network. The investigation into M. Blakley began in early 2021. The Government used undercover agents to make contact with her and with the "Blakley Clinics." Undercover operations continued until November 2023.

The undercover agents utilized in the investigation posed as a pair of friends seeking alternative treatment for a cancer diagnosis. While one of the agents posed as a "patient" of the Blakley Clinics, the other presented himself as someone interested in being a student of M. Blakley, with a goal of opening his own clinics in Florida and Pennsylvania. The agents traveled to the Blakley Clinics on twelve occasions, capturing approximately forty hours of interaction with the Blakleys. These recordings included not only the time spent at the clinic receiving "treatment" and training, but also dinners, lunches, and visits to the Blakleys' homes. (Exhibit A – chart of undercover recordings.)

On January 8, 2025, a grand jury returned an indictment against both F. Blakley and M. Blakley, alleging that from March 2021 through November 2024 they engaged in a conspiracy to commit mail and wire fraud. At that time, more than a year after the agents completed their undercover investigation, no actual patient of the Blakley Clinics had been interviewed. Agents instead took the position that contacting patients of the "Blakley Clinics" might alert the defendants to the investigation.

After the original indictment was filed on January 8, 2025, the FBI placed advertisements seeking "patients" of the "Blakley Clinics." Following these efforts, and after conducting patient interviews, the Government superseded the indictment, expanding the alleged conspiracy period by more than fifteen years, to a scheme lasting from 2006 to 2025.

In support of the nineteen-year scheme, the Government was able to locate and interview approximately eighty "patients." None of these interviews were recorded. The "patient" interviews varied significantly from each other and from the undercover agents' interactions with the Blakleys. While agents engaged in meals, extended conversations, and home visits, none of the patients reported comparable interactions with M. Blakley. Only thirteen "patients" stated that they had ever seen, heard of, or interacted with F. Blakley. Of those thirteen, only nine suggested he had any involvement with the Blakley Clinics. Two of those nine appear to have confused F. Blakley with a different male individual, an unindicted co-conspirator.

While the conspiracy alleges the victims to be the "patients" who "treated" at the Blakley Clinics for the fifteen-year period, the substantive counts of mail and wire fraud deal solely with interactions occurring between the defendants and undercover agents from May 2021 to June 2023:

| COUNT | APPROXIMATE DATE (AND TIME) | DESCRIPTION |
|---|---|---|
| 2 | May 21, 2021, at 20:45 UTC | Telephone call from Individual No. 1, known to the grand jury, from the Eastern District of Pennsylvania, to defendant JANMARIE LANZO, outside the Commonwealth of Pennsylvania, discussing the purported medical benefits of Aetheion |
| 3 | November 15, 2022, at 3:56 p.m. | Email from defendant MARY BLAKLEY outside the Commonwealth of Pennsylvania to Individual No. 3, known to the grand jury, in the Eastern District of Pennsylvania, discussing the purported smart chip on the machine that Individual No. 3 had purchased |
| 4 | November 21, 2022, at 20:41 UTC | Telephone call between defendant FRED BLAKLEY and defendant MARY BLAKLEY, outside the Commonwealth of Pennsylvania, and Individual No. 3, in the Eastern District of Pennsylvania, providing instruction on the conduct of full body scans |
| 5 | August 2, 2023, at 15:47 UTC | Telephone call from Individual No. 2, known to the grand jury, in the Eastern District of Pennsylvania, to Associate No. 2, known to the grand jury, outside the Commonwealth of Pennsylvania, discussing the purported medical benefits of fenbendazole |

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 6 | August 31, 2022 | Bank check mailed from the Eastern District of Pennsylvania via U.S. Mail in partial payment for purchase of ultrasound machine |
| 7 | January 13, 2023 | A package containing two bottles of Aetheion cream sent by defendant JANMARIE LANZO to Individual No. 2 via U.S. Mail to the Eastern District of Pennsylvania |
| 8 | June 12, 2023 | A package containing two bottles of fenbendazole sent by Associate No. 2 to Individual No. 2 via U.S. Mail to the Eastern District of Pennsylvania |

## Argument

### I.     This Court Must Dismiss Counts Two Through Eight Under Fed. R. Crim. P. 12(b)(2)

Federal Rule of Criminal Procedure 12(b)(2) permits a defendant to raise "any defense, objection, or request that the court can determine without a trial on the merits," including

challenges to the legal sufficiency of an indictment. District courts have both the authority and the obligation to dismiss legally defective counts prior to trial where the sufficiency of the indictment can be resolved as a matter of law. As the Third Circuit has long held, "the indictment, to be sufficient, must contain all the elements of a crime," a principle that "is still a vital part of our federal criminal jurisprudence." *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979) (quoting *United States v. Knox Coal Co.*, 347 F.2d 33, 37 (3d Cir. 1965)).

In evaluating such a motion, the court assumes the truth of the indictment's factual allegations and asks only whether, as alleged, the conduct constitutes a federal offense. Rule 12(b)(2) therefore requires pretrial resolution where the indictment rests on an invalid legal theory, omits an essential statutory element, or otherwise fails to state an offense even if the factual allegations are accepted as true. This procedural mechanism prevents unnecessary trials and ensures that legally deficient charges are resolved before jeopardy attaches.

a. <u>overview</u>

The federal mail and wire fraud statutes draw their meaning from the common law definition of fraud, which has always been tied to the protection of individual property rights. Although Congress broadened the statutes by prohibiting the scheme itself, rather than completed fraud, the Supreme Court has repeatedly emphasized that the statutes continue to require the common law element of materiality, requiring at least the risk to a victim of suffering the deprivation of property. Undercover federal agents, however, cannot qualify as "victims" under the mail or wire fraud statutes. They are incapable of suffering property loss, incapable of being deprived of property rights, and incapable of being influenced in the manner common law and statutory materiality require.

Accordingly, counts two through eight must be dismissed because they charge only interactions between the defendants and undercover federal agents. The undercover agents were never at risk of property loss and cannot satisfy the statutory requirement that the scheme be directed at property "in the victim's hands." Because the indictment omits an essential statutory element, counts two through eight are legally insufficient and must be dismissed.

i.   <u>Materiality is an essential element of mail and wire fraud</u>

Earlier this year, the Supreme Court confirmed that materiality, though not appearing in the wire and mail fraud statutes, is an "element of, and thus a limit on, the federal fraud statutes." *United States v. Kousisis*, 605 U.S. 114, 135 (2025). Courts have long recognized that while an indictment need not use the exact word "material," it must contain sufficient factual allegations from which materiality can be inferred. *United States v. Saybolt*, 577 F.3d 195 (2009).

A fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses. *Kousisis, supra*. A false statement is material only if it has "a natural tendency to influence, or [is] capable of influencing**, the decision of the decisionmaking body to which it was addressed**." *Neder v. United States*, 527 U.S. 1, 25 (1999).

Because materiality turns on whether a misrepresentation could influence a qualified decisionmaker, this Court must next examine the identity and role of the "decisionmaking body" to whom the statements were made in counts two through eight of the indictment. As explained below, federal agents acting in an undercover capacity do not qualify as decisionmakers because they were not exercising independent judgment, were incapable of suffering or avoiding economic harm, and were not engaged in any decision involving their own property rights.

ii.    The decisionmaking body requirement

The "decisionmaking body" concept applies broadly across federal fraud statutes, including mail fraud, wire fraud, bank fraud, and tax fraud prosecutions. The identity of the decisionmaker varies depending on the statutory context and the nature of the alleged fraud, but in all cases, courts must determine which entity possessed the relevant decisionmaking authority and received the allegedly false statements. This inquiry is indispensable, because materiality cannot exist unless the misrepresentation was capable of influencing that decisionmaker.

In *Kungys v. United States*, 485 U.S. 759 (1988), the Supreme Court articulated a three-part test for analyzing materiality in the context of false statements to government officials: (a) what statement was made; (b) what decision the agency was trying to make; and (c) whether the

statement was material to that decision. The Court later confirmed in *United States v. Gaudin*, 515 U.S. 506 (1995), that this analysis applies in criminal prosecutions under 18 U.S.C. § 1001.

Although *Kungys* and *Gaudin* involved false-statement cases, the "decisionmaking body" requirement is part of the materiality standard applied to all wire fraud prosecutions, regardless of whether the victims are government agencies or private entities. The Supreme Court reaffirmed in *Neder* 527 U.S. at 1, that a misrepresentation is material only if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Federal courts have consistently applied this same standard across fraud prosecutions involving private companies, financial institutions, individual victims, and government agencies alike. The identity of the victim does not change the materiality test; but the victim must be a real decisionmaker capable of being influenced.

Here, the only "decisionmakers" to whom the alleged misrepresentations in Counts Two through Eight were directed were undercover federal agents posing as victims. Those agents were not exercising judgment over their own money or property; they were following investigative protocols. Their "decisions" were predetermined by the objectives of a law-enforcement operation, not shaped by economic incentives, risk assessments, or personal property interests. As a result:

- They could not be induced to part with property.
- They could not suffer economic loss.
- They were not engaging in genuine decisionmaking of the kind contemplated by *Neder*.
- They lacked any property interest capable of being influenced by allegedly fraudulent statements.

Under *Neder* and *Kousisis*, materiality requires a misrepresentation capable of affecting a genuine economic decision. Undercover agents acting in a controlled, pre-scripted investigative role do not satisfy that requirement. Their function was investigatory, not decisionmaking, and their decisions were insulated from the very economic risks that the fraud statutes are designed to protect.

To satisfy the elements of wire and mail fraud, the decisionmaker must be someone exercising real property rights and capable of being influenced in a meaningful, economic sense. Undercover federal agents are neither.

Having established that undercover agents cannot serve as decisionmakers capable of being influenced, the Court must next consider the corresponding requirement that the alleged scheme target a victim with property rights at risk, a core component of federal fraud law since its common law origins.

iii.    The property right requirement

The mail and wire fraud statutes trace their origins to the common law and were enacted "in the desire to protect individual property rights." *Cleveland v. United States*, 531 U.S. 12, 26–27 (2000). In *Cleveland*, the Court emphasized that Congress "signaled no intent to depart from the common understanding that the words 'to defraud' commonly refer to wronging one in his property rights." Earlier this year, the Supreme Court reaffirmed that the term "fraud" in these statutes continues to draw its meaning from these common law principles. *Kousisis*, 605 U.S. at 135.

Although Congress broadened the common law reach by prohibiting a "scheme to defraud" thereby removing the requirements of actual reliance or actual loss, it did not abandon the core principle that the scheme must be directed toward someone who possesses property capable of being wrongfully obtained. *Neder* 527 U.S. at 25; *Cleveland*, 531 U.S. at 19. The fraud statutes remain tethered to the protection of economic interests, requiring both (1) a misrepresentation capable of influencing a decisionmaker and (2) a decision involving a potential impact on property.

This distinction is fundamental. While the government need not prove reliance or loss, it must prove there was a misrepresentation capable of influencing the victim (materiality). Materiality is therefore an objective standard focusing on the **capacity** to influence an actual decisionmaker, not on whether the victims were actually deceived. This distinction, however, depends on the existence of a *real* decisionmaker who possesses property rights capable of being affected. Undercover agents acting in an investigative capacity do not fit this role:

- They are not making economic decisions that can be influenced.
- They are not exercising personal property rights.
- They cannot suffer property deprivation.
- They are not "victims" as understood in the mail and wire fraud context.

For the materiality element to be met, the undercover agents would need to be (1) the decisionmaking body capable of influence and (2) at least potential victims whose property rights were at risk. They are neither.

In *Cleveland*, the Court reiterated that the mail fraud statute had its origin in the desire to protect individual property rights and rejected the Government's prosecution for mail fraud when the core concern of the state government was regulatory, and not a traditional property interest. The Cleveland Court held that "the mail fraud statute had had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to *the Government's interests as a property holder. Id.* at 26.

The Third Circuit's decision in *U.S. v. Cottman*, 142 F.3d 160, 170 (1998), reiterated that when the government voluntarily expends funds in law enforcement operations, it does not qualify as a victim under the Victim Witness Protection Act (WPVA) and further established that the Government does not qualify as a victim under federal restitution statutes. The Circuit found that the Government could not qualify as a victim under restitution statutes connected to supervised release when it did not so qualify under the WPVA because the statues were parallel in their definition of "victim."

The same reasoning applies here. Just as the government cannot convert its investigative expenses into a cognizable loss, it likewise cannot transform undercover agents, whose role is to create evidence, not make economic decisions, into victims possessing property rights at risk. The common law roots of the fraud statutes, the Supreme Court's decisions in *Cleveland* and *Kousisis*, and the Third Circuit's analysis in *Cottman* all confirm that the property rights requirement is a substantive limit on federal fraud prosecutions that the Government cannot evade.

Even if any doubt remains about the scope of the fraud statutes as applied here, that ambiguity must be resolved in the defendant's favor under the rule of lenity.

iv.      <u>The rule of lenity requires this court to rule in the favor of the defense</u>

While the language of the wire fraud statute is undeniably broad, *Pasquantino v. United States*, 544 U.S. 349, 359–60 (2005), it is Congress, not the courts, that defines the scope of criminal liability. As the Supreme Court reaffirmed in *Kousisis*, if Congress wishes to expand the reach of the fraud statutes, "it is up to Congress, if it so chooses, to change it." *Kousisis*, 605 U.S. at 135.

The rule of lenity applies when "if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013). Thus, where the government's interpretation pushes a criminal statute to or beyond its ambiguous limits, courts must adopt the narrower construction. If this Court has any doubt about whether Congress intended the fraud statutes to extend to situations where the only purported "victim" is a federal undercover agent, the rule of lenity requires resolving that doubt in the defendant's favor.

In *Cleveland v. United States*, the Court held that "to the extent the word 'property' is ambiguous as placed in § 1341, "we have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" 531 U.S. at 12 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). The Court emphasized that before choosing the "harsher alternative" in a criminal statute, Congress must speak "in language that is clear and definite." *Id.* (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952)).

The Supreme Court has repeatedly rejected government attempts to expand federal fraud statutes beyond their textual and common law foundations:

- In *Ciminelli v. United States*, 598 U.S. 306 (2023), the Court unanimously rejected the government's "right to control" theory and overturned a conviction built upon it.
- In *Kelly v. United States*, 590 U.S. 391 (2020), the Court reversed convictions premised on a theory that stretched "property" beyond its statutory meaning.

- In *Percoco v. United States*, 598 U.S. 319 (2023), the Court further narrowed the scope and ability of the government to prosecute under the honest-services fraud statute, overturning a conviction and holding that a private citizen with informal political influence could not be convicted under for honest services fraud.

- In *Bittner v. United States*, 598 U.S. 85 (2023), the Court declined to adopt the government's interpretation of the Bank Secrecy Act and limited the number of penalties the government could impose against a citizen who failed to report his overseas bank accounts.

The Court's holdings across these cases signal to the government, attorneys, and individuals alike that the Court will not tolerate expansive interpretations of federal statutes and regulations. Individuals should have reasonable notice of what encompasses a federal offense and, if such notice is not apparent, the DOJ should limit its charging decisions accordingly. Allowing the Government to prosecute fraud counts where the only purported "victim" is an undercover agent who cannot, as a matter of law, be deprived of property, would be inconsistent with the law and would constitute exactly the sort of unwarranted expansion *Cleveland* prohibits.

v.      Relevant Decisions

The undersigned notes that *Kousisis*, the lead case prompting the filing of this motion, was decided by the Supreme Court just earlier this year. The SCOTUS Blog covered the decision, writing: "In determining that net economic loss is not required to sustain federal fraud convictions, the court emphasized another standard to confine the scope of such prosecutions: materiality, which "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation" and "asks whether the misrepresentation 'constituted an inducement or motive to enter into a transaction.' This choice makes sense.  As the court stated in *Kousisis*, the common law has "long embraced" materiality "as the principled basis for distinguishing everyday misstatements from actionable fraud."[1]

---

[1] Richard Cooke, *Federal fraud after Kousisis*, SCOTUSblog (July 7, 2025), https://www.scotusblog.com/2025/07/federal-fraud-after-kousisis/

The undersigned has found no case, Supreme Court, Third Circuit, or otherwise, in which a mail or wire fraud conviction was sustained where the only alleged "victim" was an undercover agent and the issue of materiality was raised. The defense, in its duty of candor, discusses the relevant case law it could find below:

United States v. Senatore, 509 F. Supp. 1108 (E.D.P.A. 1981), involved counterfeit coins sold to an undercover agent. The Court found intent to defraud, but the defendant never raised materiality, and the conviction was never appealed. Senatore predates all modern Supreme Court fraud jurisprudence, including Neder, Cleveland, Shaw[2], and Kousisis, and its silence on materiality renders it of limited relevance. The opinion addressed post-trial motions and there was no appeal to the Circuit.

United States v. Gamble, 737 F.2d 853 (10th Cir. 1984), also predates the modern fraud era and does not address materiality. The Gamble court held that the Government's conduct in formulating, carrying out, and enmeshing the defendant in a mail fraud scheme was not so outrageous that that the conviction should be overturned as a violation of due process. There, although the agents created the scheme, the deceit was targeted at insurance companies, not the agents. Gamble therefore does not support the proposition that agents can be the victims of the fraudulent scheme.

In United States v. Eldridge, 375 F. App'x 948 (11th Cir. 2010), the court found that a dismissal of the indictment was not warranted on the grounds of outrageous government conduct where undercover agents, based on a tip, approached the defendant with an opportunity to pitch and investment to a fake investor, who was also an agent. While the targeted "victim" in Eldridge was an undercover agent, the defendant never raised an issue of materiality, only outrageous government conduct. Eldridge predates Kousisis by fifteen years and likewise offers no

---

[2] Shaw v. United States, 580 U.S. 63.

guidance on whether undercover agents can satisfy the victim/property materiality requirements.

b. conclusion

For all the reasons set forth above, counts two through eight cannot stand. The government's theory fails as a matter of law because undercover agents are not decisionmakers capable of being influenced, do not possess property rights at risk, and cannot serve as the victims required under *Kousisis*, *Neder*, and *Cleveland*. Proceeding on counts that lack an essential statutory element would contravene the Supreme Court's repeated insistence that federal fraud statutes remain tethered to their common law roots, ignore the limits Congress has enacted, and expose the parties and the Court to an unnecessary trial on legally invalid charges. Because these defects are apparent from the face of the indictment and cannot be cured by evidence at trial, the Court should dismiss counts two through eight in their entirety.

## II.    This Court Should Exclude the Agent Recordings and Interactions from Evidence in Relation Count One, the Conspiracy to Commit Wire and Mail Fraud.

Count one alleges a conspiracy to commit mail and wire fraud involving real patients, not undercover federal agents. As established above, the agent-created recordings and interactions cannot independently support a criminal conviction. Because those recordings and interactions do not involve actual victims, and do not reflect the interactions between the defendants and actual victims, they are inadmissible under the Federal Rules of Evidence.

Rule 403 authorizes exclusion of relevant evidence when its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or waste of time. Fed. R. Evid. 403. As the Third Circuit has emphasized, Rule 403 requires careful judicial sensitivity to the specific circumstances of the case and substantial deference to the trial court's hands on assessment. *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986). The Advisory Committee Notes clarify that "unfair prejudice" refers to an "undue tendency to suggest decision on an improper basis." The Supreme Court has explained that this

includes evidence that may "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Here, the agent recordings and interactions are only minimally relevant. A central issue in any fraud prosecution is whether the defendants made material misrepresentations or omissions to actual decisionmaking bodies in furtherance of the scheme. Undercover agents were not such decisionmakers, and their interactions with the defendants bore little resemblance to the experiences reported by real patients. The agents based their interactions with the Blakleys off a YouTube video of M. Blakley they found online, not based upon actual patient interviews and experiences. Statements made to agents, who interacted with the Blakleys in an entirely different manner than any of the purported victims, have little probative value in determining whether the defendants made materially misleading statements.

Whatever minimal probative value the recordings may have is substantially outweighed by a profound risk of unfair prejudice, confusion of the issues, and misleading the jury. The undercover operation spanned two years, generated over 40 hours of audio and video, and involved scripted and repeated government questioning, dinners, home visits, and extended access to the Blakleys. None of this was mirrored in actual patient encounters. Presenting these recordings to a jury would create the false impression that these artificial, agent-created interactions, which cannot be used by the jury to determine whether there was a material falsehood, reflect real patient experiences. The government's own interviews confirm they do not.

The contrast between the undercover interactions and patient accounts is stark:

- Agents spent hours with the defendants, shared meals with them, and visited their home. No patient reported anything resembling such personal access.
- Agents questioned M. Blakley extensively about her history, training, education, and background. Most patients reported little or no discussion of these topics.
- Agents drew heavily on a 2020 YouTube video as the foundation for their interactions. No interviewed patient reported seeing the video.
- One agent posed as a trainee—a scenario that no purported victim ever claimed to have experienced.

Allowing jurors to view two years of highly produced investigative recordings under these circumstances would be not merely confusing—it would fundamentally distort the nature of the case. Jurors may incorrectly assume that the defendants' responses to government-created

scenarios demonstrate how they interacted with real patients. They may also erroneously treat the agents as victims, despite the undisputed facts that agents: (1) were not real victims; (2) were not capable of being influenced; (3) had no property at risk; and (4) shaped the conversations themselves.

This is exactly the type of improper inference Rule 403 is designed to prevent. Because the risk of prejudice and juror confusion is severe and unavoidable, and because the undercover recordings do not meaningfully advance the jury's understanding of the charged conspiracy, the Court should exclude the undercover-agent recordings and interactions from evidence under Rule 403.

Accordingly, because the recordings are of negligible probative value and carry an overwhelming likelihood of unfair prejudice and juror confusion, their admission would undermine the fairness and accuracy of the trial. Rule 403 requires their exclusion. The Court should therefore preclude the undercover-agent recordings and interactions from being introduced in support of Count One.

## <u>Conclusion</u>

For all the reasons set forth above, the charges premised solely on undercover-agent interactions cannot stand. Counts two through eight fail, as a matter of law, to allege fraud against a real decisionmaker possessing property rights at risk and therefore do not satisfy indispensable elements of the mail and wire fraud statutes.

At the same time, the undercover recordings and interactions are at most marginally probative of the conspiracy alleged in count one and pose an overwhelming danger of unfair prejudice, juror confusion, and a distorted view of the alleged scheme, warranting exclusion under Rule 403.

Accordingly, the Court should dismiss counts two through eight of the superseding indictment pursuant to Rule 12(b)(2) and grant the motion in limine precluding the government from introducing the undercover-agent recordings and related testimony at trial. These rulings will preserve the integrity of the proceedings, focus the jury on the conduct Congress has actually

criminalized, and promote judicial economy by limiting the case to legally valid charges supported by admissible evidence.

Respectfully submitted,

Megan J. Davies, Esquire
Law Offices of Megan J. Davies
38 N. Haddon Ave.
Haddonfield, NJ 08033
Dated: December 5, 2025                                    Bar No. 313133

# EXHIBIT A

Note: There were numerous phone calls, emails and text messages that occurred in addition to the below lengthy recordings that the defense does not include in this chart but does seek to preclude from admission.

| Recording Date | Recorded Event | Approximate Length |
|---|---|---|
| Nov. 18, 2021 | Undercover Agents first time visiting a Blakley Clinic.<br>F. Blakley is not present | ≈ 2 hour recording |
| Jan. 27, 2022 | Agents second visit to a Blakley Clinic<br>F. Blakley is not present | ≈ 2.5 hour recording |
| April 8, 2022 | Agents third visit to a Blakley Clinic<br>F. Blakley is not present | ≈ 1.5 hour recording |
| June 24, 2022 | Agents forth visit to a Blakley Clinic<br>F. Blakley is not present | ≈ 2.3 hour recording |
| Aug. 11, 2022 | Agents go out to dinner with M. Blakley, F. Blakley and others<br>First time F. Blakley is present | ≈ 2.3 hour recording |
| Aug. 12, 2022 | Agents fifth visit to a Blakley Clinic<br>F. Blakley is not present | ≈ 2 hour recording |
| Oct. 20, 2022 | Agents sixth visit to a Blakley Clinic<br>F. Blakley isn't present at the clinic, but the agents insist that M. Blakley call him and invite him to lunch.<br>F. Blakley joins M. Blakley and agents for lunch. | ≈ 4 hour recording |
| Nov. 21, 2022 | Agents make phone call to the Blakleys about how to operate sonogram machine delivered to Pennsylvania.<br>Both F. Blakley and M. Blakley are on the call. | ≈ 0.8 hour recording |
| Dec. 1, 2022 | Agents seventh visit to a Blakley Clinic<br>F. Blakley is not present, agents again insist he come join them for a meal.<br>F. Blakley joins M. Blakley and agents for dinner. | ≈ 4.5 hour recording |
| Jan. 17, 2023 | Agents have dinner meeting with M. Blakley and F. Blakley | ≈ 2.3 hour recording |
| Jan. 19, 2023 | Agents eighth visit to a Blakley Clinic<br>F. Blakley not present | ≈ 2 hour recording |
| Mar.14, 2023 | Agents ninth visit to a Blakley Clinic<br>The visit is done after hours with no other patients and they all go to dinner after.<br>M. Blakley and F. Blakley both present. | ≈ 4.5 hour recording |
| May 17, 2023 | Agents tenth visit to a Blakley Clinic. They begin by having lunch at a restaurant with M. Blakley and others. They then go back | ≈ 2.2 hour recording |

| | | |
|---|---|---|
| | to the Clinic where M. Blakley scans the agent. No other "patients" are present. F. Blakley is not present for the lunch meeting or the scan. | |
| May 20, 2023 | Agents specifically plan a meeting with F. Blakley to talk about guns. They meeting takes place entirely outside of the clinic M. Blakley is not present for the meeting | ≈ 1.7 hour recording |
| June 28, 2023 | Agents travel to visit unindicted individual S.K. and meet with him at his home. Neither F. Blakley or M. Blakley are present | ≈ 1.5 hour recording |
| July 7, 2023 | Agents 11th visit to a Blakley Clinic Visit marks the agents "two year anniversary of treating" Agent receives body scan from M. Blakley and plan to go to dinner after. Agents try to invite F. Blakley to dinner but he declines. | ≈ 3.5 hour recording |
| July 8, 2023 | Agents got to visit with F. Blakley M. Blakley is not present Interaction is not related to the Blakley Clinics | ≈ 2 hour recording |
| Nov. 2, 2023 | Agents 12th visit to a Blakley Clinic Agents meet with M. Blakley at clinic where she conducts scan They call F. Blakley and invite him out to dinner. F. Blakley joins M. Blakley and the Agents for Dinner. | ≈ 2 hour recording |
| Nov. 3, 2023 | Agents visit with F. Blakley to talk about guns. Interaction is not related to the Blakley Clinics other than F. Blakey takes a phone call during the visit where a clinic visit is scheduled for the caller. | ≈ 1.6 hour recording |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | :    Criminal Action No. 25-CR-08 |
| | : |
| FRED BLAKLEY | : |
| | : |
| Defendant. | : |

---

# **O R D E R**

AND NOW, this ___ day of _____, 2025, upon consideration of Defendant Fred Blakley's Pretrial Motion to Dismiss Counts Two Through Eight of the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(2), and Defendant's Motion in Limine to Exclude Agent Recordings and Interactions, and any response filed by the Government, it is hereby ORDERED as follows:

1. Defendant's Motion to Dismiss Counts Two Through Eight of the Superseding Indictment is GRANTED.
   Counts Two, Three, Four, Five, Six, Seven, and Eight are hereby **DISMISSED** for failure to state an offense as a matter of law.
2. Defendant's Motion in Limine to Exclude Undercover-Agent Recordings and Interactions is GRANTED.
   All audio or video recordings, communications, and testimony arising from undercover agents' interactions with the defendants between November 18, 2021 and November 3, 2023 are **EXCLUDED** from admission at trial pursuant to Federal Rule of Evidence 403.

IT IS SO ORDERED.

BY THE COURT:

_____

THE HONORABLE GEORGE A. McHUGH
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | :    Criminal Action No. 25-CR-08 |
| | : |
| FRED BLAKLEY | : |
| | : |
| Defendant. | : |
| | : |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Proposed Order and Defendant's Omnibus Motions to (1) Dismiss Counts Two Through Eight of the Indictment and (2) Exclude Under Cover Agent Recordings and Interactions to be served on the Government and all counsel of record by filing those documents using the Court's ECF electronic filing system.


Megan J. Davies, Esquire
Law Offices of Megan J. Davies
38 N. Haddon Ave.
Haddonfield, NJ 08033
Dated: December 5, 2025          Bar No. 313133